Leonard Ray CAWTHON, Appellant,

v.

The STATE of Texas.

No. 12-88-00333-CR.

Court of Appeals of Texas,
Tyler.

July 20, 1990.

Rehearing Overruled Aug. 31, 1990.

Harry L. Zimmermann, Robert T. Baskett, Dallas, for appellant.

Frank Long, Dist. Atty., Sulphur Springs, for appellee.

COLLEY, Justice.

Appellant Leonard Ray Cawthon was convicted of possession of at least twenty-

eight grams of amphetamine with intent to deliver [1] by a jury who assessed his punishment at confinement for twenty years. We will affirm the conviction.

Appellant presents three points of error. First, he challenges the sufficiency of the evidence to support his conviction. Second, he specifically contends that the evidence is insufficient to establish that he possessed "at least 28 grams" of amphetamine. Third, he claims that the court erred in overruling his pretrial motion to suppress the amphetamines seized by officers under a search warrant because the information relied on by the affiant, Chief Deputy Sheriff Tim Monk, was "stale," and therefore no probable cause exists to support the issuance of the search warrant by the magistrate.

We summarize the pertinent evidence adduced by the State.

On June 18, 1988, Rains County Chief Deputy Sheriff Tim Monk signed an "Affidavit for Search and Arrest Warrant" before Inez Ivy, Justice of the Peace, Precinct No. 1, Rains County, Texas. Judge Ivy, on the same day, signed and issued the warrant, authorizing the search of appellant's residence located near Point on farm-to-market road 514. On its face, the warrant purports to authorize a search for "stolen weapons and a usable amount of [marijuana], Methamphetamines and other Contraband." Monk's affidavit recites that he had been advised by a confidential informant that Cawthon and his wife "[have] a quantity of usable amount of Marijuana, Methamphetamines and other Contraband, concealed in their residence ... [and] ... that [the informant] had observed [appellant and his wife] in possession of said Marijuana, Methamphetamines ... in the last 72 hours at [their] ... residence[.]" Monk also stated in the affidavit that he

received the information from the informant on June 14, 1988.

The record reveals that an eight-man search team executed the search warrant on the date of its issuance. During that search, State Exhibit No. 9, a "box," was found and seized. The "box" contained what was identified at trial as State Exhibit No. 9A, a bag of white powder. The powder was taken to the Department of Public Safety Laboratory in Tyler where it was examined and analyzed by Keith Pridgen, a chemist employed there. Pridgen testified that the white powder weighed 128.76 grams and "[was] 20 percent amphetamine [including] adulterants and dilutents." His words were that State Exhibit 9A "[was] 20 percent amphetamine with adulterants and dilutents [sic]." Pridgen said that he could not identify the adulterants or dilutants, but related that he "did notice what appeared to be the presence of nicotinamide[.]" [2]

Nevertheless, Pridgen's testimony on direct and cross-examination establishes that the substance found in the Cawthon residence and identified before the jury as State Exhibit 9A contained substances which consisted of twenty percent amphetamine blended with unidentified adulterants and dilutants weighing in the aggregate 128.76 grams.

We now address appellant's points of error numbers 1 and 2 by which he challenges the sufficiency of the evidence to support his conviction.

The paragraph of the court's charge applying the law to the facts at the guilt/innocence phase reads in pertinent part:

[I]f you believe ... that [appellant], either acting alone or with another as a party to the offense, as that term [3] is herein defined, on or about the 18th day of June, 1988, ... did then and there knowingly or intentionally possess with

---

**1.** Under act of June 19, 1987, ch. 666, § 3, 1987 Tex.Gen.Laws 2481, 2485 and act of May 30, 1983, ch. 425, § 7, 1983 Tex.Gen.Laws 2375–2376 (now codified respectively as Tex. Health & Safety Code Ann. § 481.103(a)(3) and § 481.113(a), (c), (d)(1) (Vernon Supp.1990).

**2.** A compound of the vitamin B complex. Webster's Third New International Dictionary, p. 1526 (1976 ed.).

**3.** The court abstractly instructed the jury on the law of parties and criminal responsibility for the conduct of another under Tex.Penal Code Ann. §§ 7.01, 7.02 (Vernon 1974).

intent to deliver a controlled substance, namely, amphetamine, having an aggregate weight, including any adulterants or dilutants, of less than four hundred grams but at least twenty-eight grams, you will find the defendant guilty....

■ Appellant makes two arguments under these points. First, he questions the proof of his *intent to deliver* the substance. He claims that since the evidence does not show that the amphetamine was "separately packaged" and therefore "delivery ready," there is insufficient evidence of the requisite intent. He contends that the "adulterants" and "dilutants" are unidentified, and therefore may be, in fact, uningestable or even poisonous. He argues that although a large amount of cash ($9,421) consisting mainly of one hundred dollar bills was found in his residence, defense evidence showed that "street dosage of amphetamine sold for 'from $10 to $15.'" Based on these facts, appellant claims that such evidence disproves that he had an intent to deliver (sell) the substance.

We find these arguments unpersuasive. According to the testimony of State witness Rick Easterwood, a criminal investigator for the Department of Public Safety, and a long-time narcotics agent, the seized substance was in a quantity large enough to provide 1,287.6 street doses[4]—an amount sufficient to supply ten users for 32 days, and one user for 321 days. We conclude that there are ample facts and circumstances established by the State from which reasonable jurors could infer that appellant possessed the amphetamine with intent to deliver it to others for money.

■ Second, appellant challenges the sufficiency of the State's proof that the amphetamine, adulterants and dilutants

weighed 28 grams or more. He argues that the evidence is insufficient because the State failed to establish that the tested sample "was representative" of the whole bag of amphetamine. He also contends that the State's proof is deficient because the State failed to introduce evidence that the adulterants and dilutants were "added to the [amphetamine] with the intent to increase the bulk or quantity of the final product." In support of his latter argument, appellant refers us to *McGlothlin v. State*, 749 S.W.2d 856, 860 (Tex.Cr.App. 1988), and *Engelking v. State*, 750 S.W.2d 213, 215–216 (Tex.Cr.App.1988). The court in *McGlothlin* adopted definitions of "adulterants" and "dilutants" that it attributed to the legislature by way of the court's interpretation of the source law[5] of Tex. Health & Safety Code Ann. § 481.002(17)(F) (Vernon Supp.1990). Those definitions articulated by the *McGlothlin* court recite that "adulterants" and "dilutants"

> [A]re compounds, substances or solutions added to the controlled substance *with the intent to increase the bulk of the product. Or, increase the quantity of the final product 'without affecting its activity.'*

749 S.W.2d at 860 (emphasis ours).

The court in *McGlothlin* (opinion delivered on April 6, 1988) concluded that the terms "adulterants" and "dilutants," as used in the Tex. Controlled Substance Act, have "a technical ... meaning, ... [and] must be read in context ..." with that meaning or sense of the words. 749 S.W.2d at 858. So the court reached a conclusion, actually mandated by the clear language of the statute, that "adulterants" and "diluents" are substances, compounds

---

4. A street dose, according to Easterwood, is ¹⁄₁₀th of a gram.

5. Act of June 17, 1987, ch. 388, § 1, 1987 Tex. Gen.Laws 1902, 1904 (formerly Tex.Rev.Civ. Stat.Ann. art. 4476–15, § 1.02(15)(F)), which reads in pertinent part:
   'Drug paraphernalia' means ... a product, or a material of any kind that is used or intended for use in ... compounding, ... preparing, ... containing or concealing a controlled sub-

stance in violation of this Act or in injecting, ingesting, inhaling or otherwise introducing into the human body a controlled substance in violation of this Act. It includes, but is not limited to:
   (F) a diluent or adulterant, such as quinine hydrochloride, mannitol, mannite, dextrose, or lactose, used or intended for use in cutting a controlled substance; .... (Hereinafter referred to as section 1.02(15)(F)).

or solutions "added to the controlled substance with the intent to increase the bulk of the product." 749 S.W.2d at 860. Since under the *McGlothlin* court's ultimate definition, these terms are virtually symonymous, we need not distinguish them because the addition of either to *any* quantity of amphetamine adds to the bulk of the controlled substance. *Id.*

From a reading of *Engelking* (opinion delivered April 20, 1988), we note that the State's testifying chemist "conceded that he did not know the composition of the remainder of [State's third exhibit]," which contained 300 grams of liquid, 0.3 grams of which was methamphetamine. In *Engelking*, two other exhibits were introduced, one contained "one gram of methamphetamine in crystalized form" and the other contained "3,240 grams of liquid, approximately two grams of which was methamphetamine." The total weight of the liquids was 3,540.4 grams, including only 3.3 grams of methamphetamine. In *Engelking*, the State's chemist testified "that an adulterant or dilutant is not necessarily a cutting agent." 750 S.W.2d at 214. The chemist also testified that "phenyl two proponel (P2P) was present in the second exhibit [containing 3,240 grams of liquid]." The chemist described P2P "as a reagent ... 'something when mixed with another substance ... produce[s] a new substance.'" The *Engelking* court later stated:

> The real question is whether the balance [after deducting 3.3 grams of pure methamphetamine] of the seized solutions may be added to the pure methamphetamine so as to exceed 400 grams.[6] In other words, is the remainder of the solution properly includable as an adulterant or a dilutant?

The court answered its own question in the negative, after noting that the State's "working definition of adulterant and dilutant [was] too broad." 750 S.W.2d at 216.

The opinion in *Engelking* is somewhat difficult to interpret. The court apparently premised its reversal and acquittal in that case on the failure of the State's expert witness to properly define the terms "adulterant" and "dilutant," saying, that the "witness believed that an adulterant was any impurity in a substance and a dilutant was any substance that makes another substance weaker. Consequently, he believed the remainder of the solutions to be adulterants and dilutants." *Id.*

Hence the court wrote:

> As it stands, the record is devoid of any evidence that the remainder of the two solutions [State Exhibits 2 and 3] contained any substance intended to increase the bulk or quantity of the final product, methamphetamine.

*Id.*

In our case, the State's witness testified that the powder consisted of 20 percent amphetamine and 80 percent "adulterants" and "dilutants." Pridgen did not identify the substances comprising 80 percent of the bag of powder, nor did he expressly testify that those substances were added to the mixture to increase the quantity (25.752 grams) of amphetamine. However, his *uncontradicted* testimony establishes that the unknown substances were in fact added for the purpose of cutting, i.e., reducing the proportion of amphetamine in the compound in the bag, weighing in the aggregate 128.76 grams. In this case, unlike *McGlothlin* and *Engelking*, Pridgen's testimony is the only expert evidence introduced before the jury. Therefore we are persuaded that neither *McGlothlin* nor *Engelking* controls our decision in this case. Moreover, section 1.02(15)(F) plainly states that adulterant and dilutants are "a ... *material of any kind* ... used or intended for use in cutting a controlled substance; ...." (Emphasis ours.) That language, unaffected by the decisions in *McGlothlin* and *Engelking*, clearly eliminates any requirement that the State must produce expert testimony identifying the noncontrolled substances utilized to cut the controlled

---

**6.** Engelking was convicted of possession of "at least 400 grams aggregate weight, including adulterants and dilutants." 750 S.W.2d at 214.

substances in the prosecution of aggravated drug possession cases.

Viewing the evidence in the light most favorable to the verdict, we are persuaded that reasonable jurors could have found beyond a reasonable doubt that each essential element of the offense was established. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Appellant's first and second points of error are overruled.

■ Appellant's claim under his third point of error is without merit. The affidavit of Officer Monk states, in part, that he

[W]as advised by Confidential [informant] that [appellant] ... [had] a ... useable amount of Marijuana, Methamphetamines ... concealed in [his] residence ... [and was] further advised [by the informant] that she had observed [appellant] ... in possession of said Marijuana, Methamphetamines ... in the last 72 hours at [his] ... residence....

Monk also stated in the affidavit that he received the above information on June 14, 1988, and that his informant "is [credible] and [the] information [is] reliable, because informant had furnished information to [Monk] concerning criminal activity in the past on several occasions and on each and every occasion said information proved to be reliable, true and correct."

The appellant complains that probable cause did not exist to support the issuance of the warrant because the information furnished by the informant was "stale," i.e., such information was "not so closely related to the time of issuance of the warrant as to justify a finding of probable cause [by the magistrate]." *See Capistran v. State*, 759 S.W.2d 121, 127 (Tex.Cr.App.1982).

Applying the standards utilized in *U.S. v. Ventresca*, 380 U.S. 102, 106–109, 85 S.Ct. 741, 744–46, 13 L.Ed.2d 684 (1965), and followed in *Capistran* (759 S.W.2d at 127), we are persuaded that the pertinent dates demonstrate that probable cause existed for the issuance of the search warrant. Therefore, we overrule appellant's third

point of error and AFFIRM the judgment of conviction.